Good morning, Your Honors. May it please the Court, my name is Nara Seguino. I'm here with Co-Counsel Ethan Balow, who assists me with the briefs. Today I speak for Marietta Terabelian. We'll begin with the Disentitlement Doctrine, then two sophisticated means. We'll submit the restitution claim on the briefs. I'd like to reserve two minutes for rebuttal. Very well. The government raises a renewed motion to dismiss under Disentitlement Doctrine its second bite at the apple, this time while Ms. Terabelian is under federal custody. Based on a hyper-technical reading of Ortega-Rodriguez, the government says the appeal should be dismissed simply because she was a fugitive at the time she filed her Notice of Appeal. I understand, Your Honors, but I think the Disentitlement Doctrine is a harsh and discretionary sanction, and it's really used to protect the appellate process. But where's the abuse of discretion, then? The abuse of discretion? Yes. Why is it an abuse of discretion? So, I don't understand, Your Honors. Well, if they employ the Disentitlement Doctrine, why did the district court abuse that discretion? So, they did dismiss, and they ended up reinstating her because they gave her a 120-day grace period to surrender, which she did. There's no question about her good-faith effort to surrender to the jurisdiction of this court, and so it was reinstated. And then once it was reinstated, the motions panel gave the government a second chance to develop its argument before the merits panel. I see, I see. And in this posture, the government, in its answer brief, has not actually raised any new Disentitlement Doctrine should be applied to dismiss her case. So, there are no new arguments. Well, isn't deterrence one of the goals of the doctrine? It is, but... To deter people from escaping, absconding. Yes, Your Honor. But I also know that, Your Honor is well aware, that in this post-Dagen world, after the Supreme Court's decision in Dagen, that deterrence and, the other one, dignity to this panel are not enough to impose this harsh, harsh sanction. This court also said in Katz, in this very thoughtful opinion of Katz, it looked at deterrence and it looked at the dignity of the courts, and said this is such a harsh, and, you know, this is such a harsh sanction, and society benefits from the review of meritorious claims, that we will decline, we will decline to exercise this sanction when the person is no longer a fugitive. But Katz is a little distinguishable in it, because Katz applied the doctrine, or would have applied the doctrine to the original appeal, but after Katz had been caught and returned, he then files a 2255 motion. And that was after he was back, you know, so that was after he came back, so there wasn't a reason to apply the doctrine at that point. The idea that former fugitives should not be subject to the disentitlement doctrine, that has been carried to direct appeals. It's also been carried in other contexts, such as immigration. Here you have both the appeal and the fugitive status contemporaneous with each other, do you not? We do. And that's the hyper-technical reading of Ortega or Ortega Rodriguez that we are contesting, because it's not, it is not justified under the rationales. The rationales is only deterrence and the dignity of the court, and we're saying that is not sufficient. If we look, if you look at the case Sudisa Art, that's a great case because that comes after Ortega Rodriguez. And that also looks at Katz. It does not say that Katz is overruled. It distinguishes it and says that, sure, you know, the person was a former, is now no longer a fugitive, but you have to look at other overriding concerns. How, you know, for example, prejudice to the case, frustration, undue delay. How did this affect the appellate process? Because disentitlement doctrine is about protecting the appellate process. That's the problem here. This is the government's motion. The motion, the government has the burden of proof, of showing, making some showing of how this affected the appellate process, and it doesn't. Aren't there some other cases, a couple of cases in other circuits that have applied the doctrine, even after the fugitive has been returned? But in this circuit, if you look at Sudisa Art, which came after Ortega Rodriguez, it does not say that Katz was overruled. It does say that you need to look at other concerns, such as prejudice. But in this case, the government makes no showing of prejudice, no showing of frustration, no showing of delay. It doesn't make any of these arguments. All it's saying is that, essentially, she was a fugitive at the time she filed her notice of appeal. And for that reason, because of deterrence, because of, you know, deterrence and dignity of the court, that should be enough to disentitle her. And under Pagan, the court says, that goes too far. That's not enough. You need something more. And we're saying that the government has not shown that something more. Well, I mean, I have this feeling, are you trying to get two bites of the – you're talking about two bites of the apple of the government having a segment, but then your client getting sort of two bites of the apple in the sense that, hey, if she was clearly a fugitive intended to escape and never be seen again, and so she would have won if she hadn't been apprehended. But then you're saying, oh, but if she was apprehended and extradited in return, but now she can still pursue her appeal as if she had never been a fugitive in the first place. Yes, Your Honor. A win-win that was not quite right. I mean, heads-I-win, tails-you-lose kind of situation. Okay. That second – but her second opportunity came because the court issued that order that said you have 120 days to return. That means she had already been a fugitive, and she never intended – she didn't want to return in the first place. That opportunity came after she was captured, so the court was aware. Well, it's like, you know, after you're – with any criminal offense, I mean, once you're apprehended, you might say, oh, I'm sorry, I didn't mean to do that. But sometimes that's a little too late, isn't it? Your Honors, I only have five minutes left, and I really need to address the merits of the claim, if that's okay. Okay. Okay. The sophisticated Indian Hanselman was amended in 2015. Under the old rule, if one person got it, everyone got it. Under the amended rule, only the people responsible for the sophistication of the crime got it. The judge applied the old rule. Her husband got it. She got it. The judge didn't say anything about her conduct being sophisticated. What he said about her was, quote, She wasn't, perhaps, essential. That's ER 33. The judge didn't really know what she did. Quote, I don't exactly know how she measured up in terms of actions within the fraud. That's ER 42. This is a court of review, not a first view. Where the district court applied the wrong rule to determine her guidelines range, this court sends it back. She was the one caught with a false credit card, wasn't she? That's correct. Yes. Which we argue is not sophisticated conduct. Possessing a credit card is not sophisticated. The government's characterization, also, of the record is incorrect. It tells this court that Ms. Tarabellian controlled a fraudulent bank account in her father's deceased name and cites to a misstatement by a witness on direct, by its witness on direct examination. This is on page 13 and 30 of its answering brief, where it cites SER 263. On cross-examination, that witness retracted that statement. That was my testimony, or was it on a chart? Why don't I just ask you to clarify now. The signer on this account for Modern Interiors is not Mary Tarabellian, correct? Yes, that's correct. That's on SER 326. The district court is in the best position to decide whether her conduct was sophisticated. We ask the court to grant her modest claim for sentencing relief. Did you want to reserve the rest of your time, counsel? Yes, please. Thank you. I'm sorry. I'm Jerry Caplan on behalf of Tomara Ghanian, and, you know, I'm not going to get into the, I want to get into the fact that basically this was an ineffective assistance of counsel, the reason she moved to withdraw her plea, which gives us a different standard than if it was just a motion to withdraw her plea. Why was it an ineffective assistance of counsel? You have a lady who has never been in the criminal justice system before, and I've been doing this 53 years. Standing up, she has her friend who has been indicted as her attorney by the Central District of California. Her friend says to her, you can trust me, and she waives the conflict in open court. In California these days, that would never be sufficient. They would ask you to at least give you the right to talk to another attorney. They would give you at least a right, and they would appoint another attorney, in most courts I've been in, and I've been in them all here in California. Why is this insufficient? Like I said, I've been doing criminal law for 53 years. You take a new person coming into this court, talking to a federal judge, with her attorney next to her, not sophisticated, and he's saying, I'll do it for you. If anything we've learned, that attorneys and clients fall out. We've learned that on a national stage. Unbelievably, when the attorney's interest is at odds with the client's interest. Well, the district court went into this, though, with her and the attorney, right? It isn't as if the court isn't fine. They went to the decision that it was a valid waiver of any potential conflict. They went into it for three minutes, and they didn't go into it to say, let's think about this, go and have some time to deal with this. They went into it three minutes, and I don't believe it's a sufficient waiver, and I believe that anyone else facing a criminal court for the first time would be, when your attorney and your friend say, don't worry, I'll take care of it, I'll take care of it, what would anyone do? But let's add to that, because that's only one little thing. Then we have this same attorney who makes a motion to continue this case. Why? Because he's unprepared, five days before she's supposed to start trial. What else do we have? We have this lady who's friendly with this attorney, texting him, I haven't seen any discovery. You haven't come by and shown me any discovery. That's all on the record. These are texts she did. Sorry, I've done this wrong. The district court looked at that aspect and didn't it? Absolutely, but the point is, you had that, is this attorney effective to her needs? You may have looked at him individually, but collectively, it's unbelievable what this lady, we all know he got the plea agreement the day before, a very sophisticated plea agreement a day before, and she's supposed to go through it with him, and she says, he didn't. Let's add to that. Well, hold on, when he went through the plea agreement, the judge went through that with her, right? Absolutely, and she said, I didn't do those things. And he said, I mean, what's knowing and intelligent? Since we're doing this de novo, what's knowing and intelligent to all of us, where a lady says, I didn't do loans 11 through 20 or 9 through 20? I mean, see, it's part of the conspiracy. That was her problem. But she said, I didn't take part in any of those. Well, as a conspirator, you don't have to personally take part. You just have to be aware of what your co-conspirators are doing. Your Honor, you may be right about the law, but the question becomes, did she knowingly and intelligently agree to plead guilty as a co-conspirator to all these items, when her lawyer says, do this or the judge is going to kill you? And, you know, you can add each one of these. I've lost each one of these separately in courts for 53 years, and I've won some. But when you take a look. Hold on. That's not what the attorney said, right? Yes, it is. He said, I'm going to kill you. No, he said. The judge is going to kill you. Oh, I see. If I said he was going to kill her, I apologize, Your Honor. I didn't mean it. He says, a judge is going to kill you. That's a quote on the record. I don't know. I mean, he obviously didn't mean that literally. He just meant the judge is going to throw the book at you if you don't plead guilty. You know, if we look at this from a practical standpoint, the attorney should have had someone else advise her as to the conflict. He wasn't prepared for trial. He got the plea agreement the last day and never gone over it with her beforehand. We all know that because you text him. I didn't get any discovery. I mean, this is not a text. I was trying to show that he was unprepared. This was a text in a desperate plea to get some information so she could make an intelligent decision. You know, and these kinds of withdrawal of pleas before sentencing are supposed to be taken quite liberally. But she didn't want to go to trial. Isn't there evidence on the record that she did? It wasn't like she was insisting on going to trial and he browbeated her into not doing it. She didn't want to go to trial in the first place anyway. Let me answer that because I think that's a valid point. Absolutely she didn't want to go to trial. I don't believe this case. But if she didn't want to go to trial for the whole time she was there and he starts plea bargaining the day before the trial, ask her, you know why? There wasn't a prior plea bargaining. One can infer because she never went through the stuff. Because she says, I never went through the stuff. She said, I never saw the discovery. Had he gone to her seven months before and said, here's what's happening, two months before, here's what's happening, she could have made an intelligent decision voluntarily to enter a plea. Would the plea have been the same? I don't know. But she has that right to deny that right is what this, you're going to say, well, she's going to plead guilty anyway, so why do we even take a guilty plea? I'm going to plead guilty. But this, this is ugly. I mean, we've got to, you know, how many times do we see a defendant represented by another defendant in the same district and the defendant being a lawyer? Very rare circumstance. And I'm not saying there can be a waiver of conflict or already, but doesn't it have to be a better asking of the defendant? Shouldn't the court appoint her a lawyer? Shouldn't the court say you have a right to another lawyer so you can make this decision? Counselor, you're out of time. Do you want to make your final point? I didn't have reserve any time. You did not. Why don't you have a seat and I'll give you a minute after. Okay. All right. This last thing is. You can make your last minute. All right. Thank you. Good morning, Your Honors. Good morning. May it please the Court, we were meant for the United States. Unless the Court prefers otherwise, I'll start with the fugitive issue and clear up some procedural back and forth. The government has not taken two shots at the apple at fugitive disentitlement. We filed a motion to dismiss this appeal before the motions panel. When these defendants were fugitives, they eventually came back, or they were extradited back. They filed motions to reinstate their appeals. The government objected. And then the motions panel allowed their appeals to go forward and kicked the fugitive disentitlement issue to the merits panel. Who is the merits panel? I mean, who are the motions panel? The names of the judges. I believe the judge can be. Maybe just when. I can't remember the third. So we are still on the first bite. And I just want to clarify what the government's arguments are and why we are seeking to dismiss, because there's a legal component and there's an equitable component. The legal component is, does this doctrine apply in this case? That's question number one. And if it legally applies, we move to the second question. How should this panel exercise its discretion? Either dismiss the case or review the merits. Let me go question one, question two. As a matter of law, the fugitive disentitlement doctrine applies because these defendants' fugitive status coincided with pending appellate proceedings before this court. That's the language from Ortega-Rodriguez. That's also the language from this court's decision in Sun v. Mukasey. Did fugitive status coincide with the appeal? If the answer is yes, we shift to the second question. How should this court exercise its equities? To opposing counsel's argument that the doctrine should not apply to recaptured fugitives. The government has cited Estelle and Allen, two Supreme Court cases, dealing with recaptured fugitives. Opposing counsel also quoted from this court's decision in Sadiqa Ard. We think that case actually confirms the government's position. Page 1208 of the opinion, Sadiqa Ard. The panel there reviewed the case law, including this court's prior decision in Katz. And this is what Sadiqa Ard says. Katz permits but does not require review of a recaptured defendant's appeal. So Sadiqa Ard, in our view, proves the government's point. The doctrine applies, and then it's a question of how this court should balance the equities. Does this court want to review the merits or dismiss? We ask, citing a number of the equities that Judge Gilman recounted at the start of this argument, this court should dismiss. To borrow language from a Sixth Circuit case that we cited, these defendants played catch me if you can at every aspect and forced the government to expend substantial resources to enlist the State Department, the government of Montenegro, the Montenegrin judiciary to bring them back. I should like Sixth Circuit cases, shouldn't I? That's the Mattersonian case from the Sixth Circuit. Counsel, what about to her argument? Her argument is that your basis of when we're balancing, you're saying, hey, the dignity and deterrence are really the basis, and that she's arguing that that should not be the – that under our case law, she argues that that should not be the case, that that should not override the discretion, I guess. So we disagree with opposing counsel. Those are valid considerations. It's obviously up to this court how it's going to balance the different equities in the case, but can I stick through the purposes that are undermining, undergirding the government's request here? Abandonment. These – Meredith Talbellin had fled the country. She went incommunicado with the district court, pretrial services, and her own attorneys. Her own attorneys, despite not having communication, but they're not abandoned as of the time of the – during the appeal. The appeal is happening, and they're here. No, so it's – does Feejit's status coincide while this court had pending appellate proceedings? And the answer is yes. And I can drill down on that. Meredith Talbellin was in Montenegro. Her attorneys, who had lost all communication with her, just filed as an abundance of caution the notice of appeals. That then triggered this court's jurisdiction, and the proceedings started running. For Tamara Doddian, she had – she filed her notice of appeal. She was in this country. She was ordered to self-report to DOP custody. And on the date that she was supposed to self-report, she flees to Montenegro, all while there's a pending case with her name on it before this court. But what's happened with her name, with her direction? These things don't just happen. I mean, the appeals were filed. Yes, and their appeals were pending, and they are in Montenegro as fugitives. And so when they flee to Montenegro, they are not just leaving this country behind. This is the abandonment rationale. They are intending to leave this court's jurisdiction behind. Second purpose underlying the government's motion is deterrence.  Therefore, if this court were to review the merits, these defendants will not have faced a single sanction for their flight to Montenegro. Third. Yes, Your Honor. Whether or not they will have faced a single sanction, my question is this. If we decline to apply the disendowment doctrine in our discretion, then I think it is a discretionary judgment now. But if we decline that, would we be required to affirm on the merits in your view? Yes, and I'm happy to switch to the merits of the claims if that's the court's preference. If the court exercises its discretion and reviews their appellate claims, it should affirm. And I'll start with Marietta Terrellian. Opposing counsel raised this challenging sophisticated means enhancement. Opposing counsel cited a number of statements the district court made at sentencing. Those statements were made in the court balancing the 3553A factors. The court, without any argument from the parties, was earlier in the proceeding, was reviewing the guidelines objections, and the court just makes the finding that the sophisticated means enhancement applies. In the reply brief, this is reply brief at page 25, Marietta Terrellian makes very clear that she's not arguing that the district court gave an inadequate explanation. So I don't think that these citations to the 3553A balancing comments by the district court have any salience in reviewing whether or not the district court appropriately applied this enhancement. Thanks to that reply brief, that clarification in the reply brief, the only issue up here right now is did the district court commit clearer error in finding that the offense conduct involved sophisticated means? And as I would ask the panel to review the citations starting at pages 10 through 13 of our answering brief, we go through and try to in detail, in painstaking detail, explain the sophistication. And I'll summarize this briefly. The court should look at the stolen Victoria Couch Co. identity. This was the identity that was on the bank account, that paid rent, that was at the Canoga Avenue apartment. That apartment at Everest was on a number of the fraudulent loan applications. It was connected to an IP address that filed one of the applications. This stolen identity was named on some of the fraudulent loans, and this stolen identity was also on the bank account that received some of the loans. So this stolen identity was connected to sophisticated, intricate criminal conduct. The question, the next question is, could the district court find by a preponderance of the evidence, 50% plus one, that Maritara Bellion was, in fact, that Victoria Couch Co., that she was using Couch Co.'s identity almost as an alter ego? The answer is yes, and particularly on a preponderance standard and clear error review. This is starting at page 10, but I'll hit the highlights. I think it was Judge Goldman who pointed out that Maritara Bellion was found in possession of a debit card at Miami Airport with Couch Co.'s name on it. Richard Vazian, Maritara's spouse, shipped an expensive watch to Victoria Couch Co., and he told the watch dealer that Victoria Couch Co. was his wife. Funds from one of the bank accounts connected to Couch Co. were used to purchase the Kali Lacrimavera home. The utilities account on that home is in the name of Maritara's mother. And finally, law enforcement searched the home of Marian and Richard, and they found phones. And on those phones was a photo of a credit card issued to Couch Co. and a photo showing the name FiberOne Media, which is another company that was central to the fraud scheme in this case. So lining all of this up, ample evidence that this Victoria Couch Co. identity is connected to sophisticated intricate criminal conduct, and the data points connecting Maritara Bellion to Victoria Couch Co. in the district court, using a preponderant standard, had ample basis to apply the enhancement, and no clear error up on appeal. I'll just briefly point out on this that one of the co-defendants, Arthur Vazian, in the prior appeal before this court, raised a similar attack on the sophisticated means, referring to the fact that, well, the government simply found fraudulent identity documents in my house, and the prior panel in this case affirmed. So could you address the challenge on the appellee, Dadian, withdrawing her appeal? Counsel spent some time on that. Yes, Your Honor, I'll switch to Tamara Dadian. So counsel, I can spell this presentation as an ineffective assistance of counsel claim. There's been no ineffective assistance claim raised in the briefs in this case, and so we would object to any consideration under a Strickland-type analysis. Ms. Dadian, if she wants, can raise that in a post-conviction proceeding. To Judge Mendoza, your question about the motion to withdraw that plea agreement. The appeal waiver provision bars that. So this court has held in published opinions that almost identical language bars a defendant from appealing a district court's denial of motion to withdraw his or her plea. The only way that Tamara Dadian can get around that before this court is to show that her guilty plea was not knowingly or voluntarily entered. And the plea colloquy is in the record. The district court went through the plea agreement, the charges, the potential penalties, the factual basis supporting the charges, the waiver of rights provisions. I don't see anything in that colloquy that's procedurally deficient. In this colloquy, Tamara says that she has confirmed to the district judge I've had sufficient time to review this case. I've had sufficient time to review this agreement. This is at 2 ER 150 and 151. Tamara Dadian confirms that nobody has pressured me or coerced me to enter into a plea. So there's nothing in this record to attack the guilty plea as not knowing or voluntary. And for that reason, the appeal waiver sticks in appellate review of that this claim is denied. Even if we look past that, the court wants to look at the merits of the district court's order. We'd be hearing an abusive discretion, and the district court issued an 11-page order after an extensive evidentiary hearing where Mr. Manassian, the defense attorney, and Ms. Dadian testified. And the district court ticks through, makes all these credibility findings and factual findings against Tamara Dadian's contentions that she reused before this court. The district court credited Mr. Manassian's testimony that he, in fact, had reviewed discovery in this case, that he was, in fact, prepared. No basis for this court to revisit that credibility determination on appeal. The district court also rejected the claims that Tamara Dadian had been coerced or pressured into the deal that she received incorrect advice. And that final point, the district court explains the inclusion of the 151 loans in the plea agreement was exactly for the reason that Judge Gilman said. She was pleading guilty to conspiracy. And so a factual basis for a conspiracy charge can include offense conduct committed by co-conspirators in furtherance of the scheme. So even if the court looked past the appeal waiver provision, it cannot show an abuse. of discretion in the district court's thoughtful denial of the plea. I have no other affirmative points I would like to make on the merits claims. I would like to return to fugitive disentanglement and just make two quick points, if I may. But I don't want to interrupt if there are any questions on the merits, the appellate claims. I'd like you to get back to that document on why you think it's so important to the government that we should adopt your primary position, as I gather, that we should apply the document. Because this was, if you look at the case law, this is about an extreme fact pattern in terms of fugitive status, as we've come across. I mean, the cutting off, Marietta Terrible in cutting off her ankle bracelet, fleeing to Montenegro, living in a seaside villa, trying to access funds from a bank account in the United States and siphon them into Montenegro, leaving minor children in the care of relatives here in the United States, leaving those relatives financially responsible for their bond obligations. This is the type of conduct that both we think constitutes an abandonment. When they fled to Montenegro, they had no intent to come back to this country. Well, counsel, I guess I do have a problem with the abandonment point, only because the appeal was filed. I mean, how can you abandon something where you actually had filed the appeal? They filed the appeal. So they filed the appeal, and then Tamara got in and left the country, so that we think that that is clear evidence of her intent to abandon the proceeding. So for Marietta Terrible, and she had already fled the country. This is, I think it's a docket, entry four of this court's docket. Her attorneys said we filed, her criminal counsel said we filed a notice of appeal, even though we haven't even talked with her, just to preserve her appellate rights. But at that time, though her trial attorneys told this court, we have not been in contact with Marietta Terrible. We have tried to contact her. This is in their motion to withdraw from the case. And so I'm struggling to see a scenario where this appeal was filed simply because their trial counsel wanted to protect her rights, but had not been given any affirmative instruction to appeal. How then, Marietta Terrible, living in a seaside villa in Montenegro, can somehow continue to pursue this appeal for months, even though she is on fugitive status? This reminds me of the fact pattern in the Puzangari case, the First Circuit case that we cited. This is where that defendant is in Massachusetts, flees to Nashville, lives under an assumed name, uses credit cards in the assumed name, and the First Circuit dismisses the appeal in its discretion under the Fugitive Disentitlement Doctrine, reasoning that this defendant, who was recaptured involuntarily in a distant city under an assumed name, violating obligations under court orders, this defendant had very few, if any, equities left to argue. These defendants are in the exact same place as that defendant. Briefly comment on the defendant's reliance on caps. I wanted to stress something that Judge Gilman, you alluded to in one of your questions. So caps was the defendant who absconded during this court's appellate proceedings, came back, extradited back from, I think it was Norway, files a Section 2255 petition. This court, in addressing and rejecting the government's Fugitive Disentitlement assertion on page 612 of the opinion, says two things. First, the caps panel said that Fugitive Disentitlement would have warranted dismissal of the caps' appeal if he had filed one. Then it turns to the Section 2255 case, and the caps panel says, but we have not previously applied the doctrine to a defendant who escaped after conviction, was recaptured, came back to the country, and then pursued further legal remedies. This case is in the first bucket. And caps make very clear that this was an appropriate request by the government to disentitle a defendant to direct appeal if he or she goes on Fugitive Status. If Tamara and Mariana want to file 2255 proceeding in the future, we read caps to say that the Fugitive Disentitlement doctrine doesn't apply. I can give the court a data point. Richard Avazian is another co-defendant in this case. He filed a 2255 already in the district court. The district court denied relief, but the government did not assert Fugitive Disentitlement as to the 2255 proceeding. Caps makes very clear that the Fugitive Disentitlement doctrine is appropriate under the facts of this case. So we think caps helps us, doesn't hurt us. Lastly, opposing counsel referenced the Supreme Court's decision in Deegan. Deegan is irrelevant. In Deegan, the Supreme Court addressed whether or not we're going to expand the doctrine beyond the criminal case to a parallel related civil proceeding. And the Supreme Court says, we're not going to do that. That's a novel application of the doctrine. We're not going to take it to another case. We're not doing that here. This is not a parallel proceeding. This is the criminal proceeding. This is the appeal stemming from the defendant's judgment of conviction. What about the notion that it could be applied in other areas of law? So the court can take this one by one as we, so as it approaches novel circumstances. As opposing counsel pointed out, the court has looked to the doctrine in immigration cases. This case here is a traditional application of the Fugitive Disentitlement doctrine. These defendants fled at the same time they were trying to initiate appeals in this court. They come back months, I think in Tamari's case, even later, I don't remember the exact time period. Very long. Yes, they do. And then come back to go to your point, Judge Gilman, and seek to proceed in this court as if none of this happened. The doctrine fully supports the government's request to dismiss these appeals. Going back to that First Circuit case, had the defendant's plans not gone awry, the First Circuit said they would still be fugitives. They would not be here. It's only because of the substantial efforts and resources of the government, of our Montenegro partners, and the Montenegro judiciary that these defendants were extradited back. Just hold on. Judge Gouldard, do you have any additional questions? No questions. Judge Gilman, any additional? We ask that the court either dismiss the appeals or affirm. Thank you. Thank you. Go ahead, counsel. Thank you, Your Honors. First, I wanted to make sure that I addressed Judge Gilman's concern about the second chance. I wanted to just clarify, we're not opposed to second chances. We just wanted to clarify the procedural posture, which is that this is the second time that this issue has been raised before this court. Okay? But, yeah, we love second chances, and I think that's one of the things that the government is ignoring the court, ignores, is the fact that this court gave her the second chance to return to the jurisdiction to save her appeal, and that's what she did. Not only did she consent to extradition, she consented to expedited extradition under Montenegro's abbreviated procedures to get back to this jurisdiction of this court as quickly as possible. So at that juncture, after she had taken, you know, accepted the carrot to sanction her anyways, we think under Dagan it's just too harsh a punishment. The government says that Ms. Tarabayan will not have been sanctioned at all, and that's not true. She got the plus two for obstruction of justice. She was also charged under Section 3146 for failure to appear. She was punished, and it also points to different facts in her escape to say this is why disentitlement should be applied. Disentitlement is not about protecting law enforcement. It's not about protecting the government's interests. It's about protecting the appellate process. You look at all the rationales for disentitlement doctrine, and it's all about the appellate practice. And so we're asking the government to show, what have you shown here? Have you shown prejudice? Have you shown delay? Have you shown frustration with your case? You haven't shown any of those things. You're essentially just saying that because, you know, the facts of her escape were bad, right, which doesn't affect the appellate process, you're saying that because she was a fugitive at the time the notice of appeal was filed, that that's enough, and that's not what the cases say. That's not what Ortega-Rodriguez says, and that's not how the case has been handled. We don't want other people to do what your client did, do we? No, we don't. That is the deterrence aspect. But what makes our client's case different is that you offered her the opportunity, and she took it. I also wanted to, let's see, move on to the sentencing claim. So he said that our point is not that the judge's explanation was inadequate. Our point is that the judge just applied the wrong rule, and we wanted to show statements to show that he applied the wrong rule. Under the old rule, you didn't even need to show, you didn't need to show any sophisticated conduct. It was just enough that one person had it. It was enough that there was sophisticated means used in the scheme, and that was enough. And so we wanted to show that he doesn't think that she's exercising sophisticated conduct, and that's what we're using the statements to show. That's not what he's thinking. He's operating under the old rule, and that's de novo review. They also try to link Couchco to Ms. Tarabellion. The judge never found that Ms. Couchco was Ms. Tarabellion. He never makes that finding. They made these connections, but the connections, they clearly should require the district court to go through it because it's a fact-based inquiry. He's the most, you know, he's in the best position to see it. There's a lot of evidence that the sophisticated people in this lab, they were the ones who controlled her identity. And, you know, what he said about her was she wasn't essential. Do Your Honors have any questions about Katz or Dagan that I could address for you? Are we good on that? I don't. No questions. Any additional questions? No questions. All right. Thank you, Counsel. Thank you so much. Counsel, you have a minute. I don't want to take too much of my minute walking. You know, ineffective assistance of counsel is our basis for setting aside the plea because ineffective assistance of counsel, I know it can be raised post-trial, but if it's on its face, ineffective assistance of counsel, how can that plea? Counsel, you can't say that it's on its face when we have a record of the judge asking. I mean, I've done hundreds of these pleas where you ask a series of questions to the defendant, and when they answer, I wasn't, you know, I wasn't coerced. I wasn't, you know, forced to do this. What are we supposed to do when we're reviewing that transcript? How many of those people ever had an attorney that was indicted by the same district that you heard those guilty pleas for? Add that to it. And the answer to that is I'd say none. I'd say there's so few of those cases in the United States where an attorney is indicted by the same people that are indicting his clients. No court would allow that to go forward without appointing another attorney or at least giving her the right to talk to another attorney, which this is. Counsel, counsel, judge Gold with a question. Sure. Normally, in my experience, ineffective assistance of counsel claims are best presented in a habeas petition because you can make a record of the reasons why people did stuff. And we get worse at this point. An argument requires us to sort of speculate. I hear you, Your Honors. Thank you for taking your time. I would also ask you to take a look at one last thing, and that is the acceptance of responsibility, which I think those two points that were given here were. But I made all those arguments. I have no new arguments other than my brief. All right. Thank you. Judge Gold, any additional questions? No questions. All right. Thank you for the presentation today. We appreciate it very much. This matter will stand submitted.
judges: Gilman, GOULD, MENDOZA